RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0331p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MEMPHIS A. PHILIP RANDOLPH INSTITUTE; THE EQUITY
ALLIANCE; FREE HEARTS; THE MEMPHIS AND WEST
TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL; THE
TENNESSEE STATE CONFERENCE OF THE NAACP;
SEKOU FRANKLIN,

        *Plaintiffs-Appellants*,

*v.*

TRE HARGETT; MARK GOINS; AMY P. WEIRICH,

        *Defendants-Appellees*.

No. 20-6046

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00374—Eli J. Richardson, District Judge.

Decided and Filed: October 15, 2020

Before: MOORE, GIBBONS, and READLER, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Danielle Lang, Jonathan Diaz, Molly Danahy, Ravi Doshi, Caleb Jackson, CAMPAIGN LEGAL CENTER, Washington, D.C., William L. Harbison, Christopher C. Sabis, SHERRARD, ROE, VOIGT & HARBISON, PLC, Nashville, Tennessee, for Appellants. Sarah K. Campbell, Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees.

      GIBBONS, J., delivered the opinion of the court in which READLER, J., joined. MOORE, J. (pp. 17–53), delivered a separate dissenting opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   In the midst of the COVID-19 pandemic, absentee voting has found its way into the spotlight.  Record numbers of voters are expected to vote by mail in the November 2020 election, and the increased interest in absentee voting has also led to increased interest in the policies and procedures governing how and when voters may vote absentee.  In resolving cases of significant public interest, judges must, as they do in all cases, reach decision by employing independent, unbiased analysis, based on the law and the facts of a particular case.

The plaintiffs in this case consist of individuals and organizations located in Tennessee, and together they have brought five claims challenging the Tennessee statutory scheme that governs absentee voting.  One claim challenges the eligibility criteria that Tennessee has imposed for absentee voters, one claim challenges limits on the plaintiffs' ability to distribute unsolicited absentee ballots, two claims challenge Tennessee's procedures for verifying voter signatures on absentee ballots, and the final claim challenges a restriction on first-time voters' ability to vote absentee.  Our decision today deals only with the two claims involving Tennessee's signature verification procedures.  For the reasons that follow, we **AFFIRM** the district court's order denying the plaintiffs' requested preliminary injunction on those claims, although we do so on a basis different from that relied on by the district court.

**I.**

Tennessee gives voters who fall within certain enumerated categories the opportunity to "vote absentee by mail." Tenn. Code Ann. § 2-6-201.  One such category includes people who are hospitalized or ill, those with physical disabilities, or caretakers for such persons. *Id.* § 2-6-201(5)(C)–(D).  Tennessee has recently interpreted this category to encompass "persons who have underlying medical or health conditions which render them more susceptible to contracting COVID-19 or [are] at greater risk should they contract it . . . , as well as those who are caretakers

for persons with special vulnerability to COVID-19." *See Fisher v. Hargett*, 604 S.W.3d 381, 385 (Tenn. 2020); Appellees' Br. at 6–7.

Historically, only about 2.5% of Tennesseans have voted absentee by mail. That number could be expected to rise for the upcoming election due to the COVID-19 pandemic.

Since the identity of a person who votes by mail cannot be verified as easily as someone who votes in person—in-person voters must present photo identification—the legislature has established procedures and conditions for absentee voting with which it demands "strict compliance." Tenn. Code Ann. § 2-7-112(a)(1); § 2-6-101(c); *see also City of Memphis v. Hargett*, 414 S.W.3d 88, 110 (Tenn. 2013). The voter must first send a formal request or application to vote absentee by mail to the county election commission office, which must take place "not more than ninety (90) and not later than seven (7) days before the election." Tenn. Code Ann. § 2-6-202(a)(1). The request must be written, signed, provide certain identifying information, and establish the voter's eligibility to vote absentee by mail. *Id.* § 2-6-202(a)(1)–(3). The county administrator of elections reviews requests to vote absentee by mail. *Id.* § 2-6-202(b), (d). In addition to determining whether the voter has provided the requisite information and established eligibility to vote absentee by mail, the administrator "shall compare the signature of the voter [on the request] with the signature on the voter's registration record." *Id.* If the administrator determines the signatures are "not the same," then the request is rejected, and the voter is notified in writing. *Id.* §§ 2-6-202(b), 2-6-204(a)(3). If, however, the voter's signatures are the same and the voter otherwise qualifies to vote absentee by mail, then the administrator "shall" mail the voter absentee ballot materials. *Id.* § 2-6-202(d).

Voters who qualify to vote absentee by mail receive (1) an absentee ballot; (2) an inner envelope in which to place the completed ballot; (3) an outer envelope in which to return those materials; and (4) instructions. *Id.* § 2-6-202(d). On the inner envelope is an affidavit that the voter must sign under penalty of perjury to verify that he or she is eligible to vote in the election. *Id.* § 2-6-202(e); § 2-6-309. Once the voter has completed the ballot, signed the affidavit, and placed the materials in the outer envelope, the voter returns the materials by mail to have the ballot counted. *Id.* § 2-6-202(e). The ballot must be received by no later than the time the polls close. *Id*. §§ 2-6-202(e), 2-6-303(b). "Upon receipt by mail of the absentee ballot, the

administrator shall open only the outer envelope and compare the voter's signature on the [affidavit[1]] with the voter's signature on the appropriate registration record." *Id.* § 2-6-202(g). If the signatures match, then the ballot is counted. *Id.* ("This signature verification is the final verification necessary before the counting board counts the ballots."). If, however, the administrator determines the signatures do not match, then the ballot is rejected, and the voter is "immediately" notified in writing. *Id.* §§ 2-6-202(g), 2-6-204(b). This method of signature verification is not a new requirement in Tennessee. *See* 1994 Tennessee Laws Pub. Ch. 859 (S.B. 2556). Historically, county election officials have quickly notified voters whose absentee ballots were rejected, including contacting voters by mail, phone, and email.

The statutory scheme does not provide a voter an opportunity to cure a signature defect before her absentee ballot is rejected. However, voters whose ballots are rejected may submit a new absentee ballot or cast a provisional ballot in person (either during early voting or on election day), provided they do so by close of polls on election day. Tenn. Code Ann. § 2-7-112(a)(3). Additionally, voters who are concerned that their absentee ballot might be rejected may cast a provisional ballot even before being notified of a rejection. Tenn. Code Ann. § 2-7-112(a)(3)(A). If the voter's absentee ballot is ultimately accepted and counted, the provisional ballot will be discarded. But if the absentee ballot is rejected, the provisional ballot will be counted. *See* Tenn. Code Ann. § 2-7-112(a)(3)(B)(iii)-(v).

The plaintiffs—a Tennessee voter who wishes to vote absentee by mail in the upcoming general election[2] and organizations engaged in voter outreach with members who wish to vote absentee by mail—do not dispute Tennessee's authority to impose a signature verification requirement for absentee ballots. Nor do they challenge the first signature verification step, which takes place before election officials send the voter an absentee ballot. Rather, they allege that Tennessee's second and final signature verification process is constitutionally inadequate,

---

[1]Unaltered, the statute reads: "Upon receipt by mail of the absentee ballot, the administrator shall open only the outer envelope and compare the voter's signature on the *application* with the voter's signature on the appropriate registration record." Tenn. Code § 2-6-202(g) (emphasis added). We agree with the defendants that in context the statute is referring to the affidavit on the inner envelope. The plaintiffs do not suggest this apparent error is significant.

[2]On September 29, 2020, while this interlocutory appeal was pending, the district court dismissed Plaintiff Kendra Lee, who was not a party to this appeal, without prejudice at her request.

violating their right to procedural due process under the Fourteenth Amendment and fundamental right to vote under the First and Fourteenth Amendments.

Although the statutory scheme is silent as to how election officials are to go about the business of verifying signatures on absentee ballots, the parties do not dispute the salient features of Tennessee's signature verification program, which the defendants—Tennessee's Secretary of State and the Coordinator of Elections for the State of Tennessee[3]—are charged with executing. In particular, the parties agree that the officials charged with verifying absentee ballot signatures receive at least some training on signature verification. This training consists of a video prepared by the Election Division of the Oregon Secretary of State, which is supplemented by directives from the Division of Elections for the Tennessee Office of the Secretary of State. Among other things, the Division of Elections directs officials to apply a presumption in favor of the validity of the signature. The training video instructs officials that "all but the most obvious of inconsistent signatures are to be regarded as acceptable." (R. 46-1, Goins Decl., at ¶¶ 23–24.) Election officials must compare the questionable signature "with as many exemplars on file as possible." *Id*. at ¶ 26. A signature should not be rejected unless three officials, including the county election administrator, determine that it is inconsistent with the signature on file.

The parties are also in general agreement as to the number of ballots that have been reported rejected for inconsistent signatures in the 2016 and 2018 national elections—around 0.03% and 0.09% respectively—although they disagree about the significance of these figures.

Of course, it does not follow from the lack of dispute over the salient features of Tennessee's signature verification program that the parties agree on that program's effectiveness. The defendants, pointing to the strikingly small rejection rate, insist that the state's signature verification procedures are effective and that there is no evidence that the rejections that did occur were erroneous, rather than proper rejections of invalid ballots. In particular, the defendants point to an absentee ballot cast in 2018 by a voter who had already died as evidence that the signature-verification process has prevented fraudulent ballots from being counted. The

---

[3]Plaintiffs also sued the Shelby County District Attorney General in her official capacity seeking to enjoin her from enforcing a separate section of the Tennessee law. She is not involved in the signature verification process.

plaintiffs, for their part, insist that Tennessee's training is more likely to produce erroneous signature verification determinations than to accurately reject ballots that do not have a genuine signature. This is because, according to the plaintiffs' expert, a forensic document examiner, it is particularly difficult without extensive training to tell the difference between the natural discrepancies in a voter's signature from signing to signing—attributable to factors "including age, health, native language, and writing conditions"—and variations attributable to the signature being forged by a different person. (R. 40-4 Mohammed Decl. I, at ¶¶ 21–23, 28–37.)

The plaintiffs filed suit on May 1, 2020, one week after Tennessee issued its April 23, 2020 COVID-19 Election Contingency Plan, which had allowed voters to claim the risk from COVID-19 as a valid reason to vote absentee. On June 12, 2020, one day after the defendants filed their answer, appellants filed the operative amended complaint and moved for a preliminary injunction.

The plaintiffs argue that Tennessee's signature-verification procedures violate procedural due process and infringe on the right to vote. The plaintiffs challenged the signature-verification laws on their face, and not as applied during the COVID-19 pandemic, arguing that the laws "will have serious consequences on the ability of Tennesseans to vote" due to increased absentee voting during the pandemic. (R. 39, Am. Compl., at ¶ 65.) The plaintiffs sought an injunction that would require Tennessee election officials to provide absentee voters notice and an opportunity to cure signature inconsistencies before rejecting their absentee ballots.

The defendants opposed the request for preliminary injunctive relief on multiple grounds. As relevant to this appeal, the defendants argued that the plaintiffs lacked Article III and third-party standing, that the plaintiffs were unlikely to succeed on the merits of their claims, and that the harm an injunction would cause to the State and the public interest outweighed the plaintiffs' alleged harms.

The district court proceeded on the plaintiffs' motion—which also sought to enjoin other facets of Tennessee's vote by mail procedures—in pieces. It reached the plaintiffs' signature verification claims on August 28, 2020 and denied the plaintiffs a preliminary injunction on the grounds that they had failed to establish a likelihood of success on the merits or that they would

suffer irreparable harm if the district court denied the injunction. This interlocutory appeal followed.

## II.

**A.**

"A district court must balance four factors in determining whether to grant a preliminary injunction: '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.'" *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Summer Cnty. Schools*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "[T]he party seeking a preliminary injunction bears the burden of justifying such relief." *Livingston County*, 796 F.3d at 642 (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)); *see also Tenke Corp.*, 511 F.3d at 546 n.2 ("[I]n seeking a preliminary injunction, a federal plaintiff has the burden of establishing the likelihood of success on the merits.").

Whether the movant is likely to succeed on the merits is a question of law, which this court reviews de novo. *Ammex, Inc. v. Wenk*, 936 F.3d 355, 360–61 (6th Cir. 2019) (citing *City of Pontiac Retired Employees Ass'n v. Shimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). Otherwise, we review the district court's "ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief" for abuse of discretion. *Shimmel*, 751 F.3d at 430. Under the abuse-of-discretion standard, this court "may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact." *Id.*

**B.**

**1.**

While the district court did not directly consider the question, we begin our analysis with whether the plaintiffs have standing. Without standing, we lack subject matter jurisdiction over the claims before us. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Thus, a "party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Waskul v. Washtenaw Cnty. Community Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). "However, an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case." *Vilsack*, 808 F.3d at 913.

The doctrine of standing arises from Article III of the Constitution, which gives federal courts jurisdiction over cases and controversies. U.S. CONST. art. III § 2; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992). To establish standing, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and is likely to be redressed by a favorable judicial decision. *Id.* at 560–61. To win declaratory or injunctive relief, a plaintiff "must show actual present harm or a significant possibility of future harm." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). An organization may have standing either in its own right, *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (Cir. 2016), or on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). During the pleading stage, the burden remains on the plaintiffs to clearly allege facts that demonstrate each element of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

An injury in fact must be concrete, particularized, actual, and imminent. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Put another way, the "threatened injury must be '*certainly impending*' to constitute injury in fact, and '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

(2013) (internal quotations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). When the plaintiffs' allegations of future injury are based on past human errors, the plaintiffs face a high bar to demonstrate standing. *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). In *City of Los Angles v. Lyons*, the plaintiff sought an injunction against the City of Los Angeles to ban the use of chokeholds by law enforcement officers in most circumstances. 461 U.S. 95, 97–98 (1983). The plaintiff argued that he had standing to seek the injunction because a Los Angeles officer had previously put him in an illegal chokehold. *Id.* at 105. The Court found that the threat of future unlawful conduct by some law enforcement officers did not establish standing. *Id.* at 105–06. The Court reasoned that standing would require proof either "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 106. Otherwise, the plaintiff's allegations failed to demonstrate an imminent risk of harm sufficient to seek injunctive relief. *Id.*

This court recently applied *Lyons* in another case challenging Tennessee elections procedures. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020), *cert. denied*, --- S. Ct. ----, 2020 WL 5882333 (2020). In *Shelby Advocates*, one organizational plaintiff and four individual plaintiffs alleged "a variety of election administration problems," including that "election workers [were] poorly trained, sometimes distributing the wrong ballots . . . , sometimes recording the wrong address when registering a voter, and once distributing a poll book without redacting voters' personal information." *Id.* at 980; *see also id.* at 981 ("The complaint's allegations with respect to injury all boil down to prior system vulnerabilities, previous equipment malfunctions, and past election mistakes.") The *Shelby Advocates* court found that the plaintiffs failed to allege imminent harm because there was no evidence that "Shelby County election officials always [made] these mistakes" or that "the government entities ordered the election workers to make any such mistakes." *Id.* at 981. The court held that policies like the ones challenged by the plaintiffs which only "add risk to the ever present possibility that an election worker will make a mistake" do not, without more, create a threat of imminent injury. *Id.*

Here, the plaintiffs have clearly not demonstrated that they face an actual, concrete, particularized, and imminent threat of harm. The plaintiffs' allegations involve two layers of speculation about the upcoming election. First, they argue that based on historical rejection rates, which were 0.03% in 2016 and 0.09% in 2018, that some absentee ballots will be rejected for inconsistent signatures. Second, the plaintiffs claim that an unknown number of the ballots that are rejected will be erroneously rejected because of human error, thereby infringing on the plaintiffs' members' constitutional rights. The plaintiffs do not cite any official data to support their theory that some of the absentee ballots will be incorrectly rejected. They also do not allege that one of their members has had an absentee ballot erroneously rejected in the past. Instead, they rely on the expert opinion of a forensic document examiner. After reviewing the Tennessee statutes and academic literature, the plaintiffs' expert concluded that it was highly likely that the Tennessee officials will erroneously reject some absentee ballots in the upcoming election. The expert explained that even forensic examiners make mistakes when verifying signatures, so it is likely that Tennessee election officials will make mistakes as well.

While the dissent contends that the forensic examiner's opinion is unrefuted, in the district court the defendants argued that the expert's opinion was based on a misunderstanding of Tennessee election safeguards. Specifically, the defendants provided declarations from Tennessee election officials who detailed the procedures they have put in place to protect against human errors in the signature verification process. For example, election officials watch a mandatory training video, where they are instructed to accept all but the most obviously inconsistent signatures and to compare each signature to as many examples on file as possible. Officials are required to start from the presumption that signatures are valid and look for ways to accept rather than reject each ballot. Before any ballot is rejected for inconsistent signatures, three trained election officials, including an administrator, must agree that the signature on the absentee ballot does not match the signature in the voter registration records. Given the training and protections practiced by Tennessee officials, it is far from inevitable that an absentee ballot will be incorrectly rejected due to an inconsistent signature.

Moreover, the dissent's reliance on the forensic document examiner's opinion goes beyond the bounds of the examiner's expertise. A forensic document examiner is a forensic

scientist who gives expert opinions about the authenticity of particular documents. Perhaps such experts are qualified to tout generally their own expertise in verifying documents over that of a lay examiner. But that is not the approach of the plaintiffs' expert. Instead, he speculates that lay election workers, in the face of increased absentee ballots, will not do as well as they have done in the past in verifying signatures. This opinion relates to the personal characteristics of Tennessee election workers, suggesting that they will be less diligent than they have been in the past if they are faced with more work. This is an area in which the document examiner has no expertise and one in which his opinion amounts to pure speculation. His opinion on this point fails to support an inference of imminent harm.

Furthermore, even if an individual's ballot is erroneously rejected as part of the signature verification process, the individual may still have an opportunity to vote through another means. Under Tennessee law, officials are required to notify individuals "immediately" if their ballot is rejected due to an improper signature, and officials go to great lengths to promptly notify affected voters. After they are notified that their absentee ballot has been declined, voters are able to either send a second absentee ballot or cast a provisional ballot in person. Many voters, therefore, will likely have an opportunity to cure any errors in their initial absentee ballot. Tennessee also has procedures for disabled individuals who are unable to write their signature or mark; they may go to their voting precinct and cast a ballot with the assistance of an election administrator. Tenn. Code Ann. § 2-7-112(b). Thus, even in the remote possibility that someone requests an absentee ballot and in the interim suffers an injury rendering him unable to replicate his previous signature, Tennessee provides safeguards for that individual's right to vote.

In sum, the plaintiffs have failed to meet their burden of establishing that they are at risk of a concrete, imminent injury. Their alleged injury is even more remote than the allegations brought by the plaintiff in *Lyons*. In *Lyons*, the plaintiff had actual evidence of past injury. Here, the plaintiffs cannot cite with certainty or specification any past *erroneous* rejection of an absentee ballot. If concrete evidence of past harm was not enough to establish standing in *Lyons*, then the speculative allegations of past and future harm in this case are certainly insufficient. Accordingly, the plaintiffs have failed to make a substantial showing of standing because they

have failed to demonstrate that they are facing an actual, concrete, particularized, and imminent injury.

Despite the dissent's insistence, this case is not controlled by *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004). In *Sandusky*, plaintiffs challenged Ohio's provisional ballot system, which they argued violated federal election laws. *See id.* at 570–71. There, this court held that the plaintiffs had standing even though they could not identify which future voter would be erroneously turned away at her polling place on election day. *Id.* at 574. The court explained that:

> [A] voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is *inevitable*, however, that there will be such mistakes.

*Id.* (emphasis added). Unlike the plaintiffs in *Sandusky*, the plaintiffs here have failed to show that human errors are inevitable. We are not, as the dissent implies, asking the plaintiffs to predict the future and specifically identify which absent ballots will be erroneously rejected. We are simply asking for the plaintiffs to show, as is required under *Sandusky*, that such errors surely will happen. They have not done so. Instead, the plaintiffs' allegations boil down to fear of "the ever present possibility that an election worker will make a mistake." *Shelby Advocates*, 947 F.3d at 983. As was the case in *Shelby Advocates*, "[a]ny analogy to *Sandusky* falls short." *Id.*

Because we find that the plaintiffs have not demonstrated an injury in fact, they cannot show either direct organizational standing or representative standing on behalf of their members.[4] Even if the dissent is correct that the plaintiffs have significantly shifted their operations, activities, and strategies in response to the COVID-19 pandemic, that would not overcome the plaintiffs' imminence problem. "An organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Shelby Advocates*, 947 F.3d at 982 (citing *Clapper*, 568 U.S. at 416); *see also Fair Elections Ohio v. Husted*,

---

[4]The plaintiffs make the barest of arguments that the remaining individual Plaintiff, Sekou Franklin, is likely to have standing of his own accord. Because this argument was not raised below and was only raised on appeal in a footnote in the plaintiffs' reply brief, we decline to address it.

770 F.3d 456, 460 (2014). Therefore, under any theory, the plaintiffs have failed to show a substantial likelihood of standing because they have not shown a threat of actual, imminent harm. This alone is enough to affirm the district court's denial of plaintiffs' motion for a preliminary injunction.

**2.**

Given our conclusion that the plaintiffs have failed to show a substantial likelihood of establishing standing, we need not go further. However, we will provide limited commentary to guide the district court in the ultimate resolution of various issues in this case. On the merits, the plaintiffs advance two theories of how the Tennessee signature verification procedure violates the constitutional rights of their members. First, Tennessee's failure to provide pre-rejection notice and the opportunity to cure a signature mismatch before the ballot is rejected violates procedural due process. Second, the current procedure violates the fundamental right to vote because the failure to provide pre-rejection notice and an opportunity to cure will result in "the absolute deprivation of eligible voters' right to vote." (CA6 R. 28, Appellant Br., at 12.)

When considering whether a challenged state action violates procedural due process, we first consider whether there is a protected liberty interest. *Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020). If there is a protected liberty interest, we consider "what process is due." *Id*. The plaintiffs assert that there is a state-created liberty interest in voting absentee and having one's absentee ballot counted and argue, therefore, that this court should determine what process is due under the factors established in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The defendants argue that this court should not conduct a separate analysis under *Mathews* because the *Anderson-Burdick* balancing test "provides a single standard for evaluating challenges to voting restrictions." (CA6 R. 29, Appellees' Br., at 18–19.) Under *Anderson-Burdick*:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). The nature of the burden the signature verification process places on voters determines the standard of review. Rational basis review applies if the requirements are "reasonable nondiscriminatory restrictions" and "the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (internal citation omitted). Strict scrutiny applies if the signature verification process presents "severe restrictions, such as exclusion or virtual exclusion from the ballot." *Thompson v. Dewine*, 959 F.3d 804, 808 (6th Cir. 2020). And if the signature verification process falls somewhere between a "reasonable nondiscriminatory restriction" and a "severe restriction," this court weighs the burden imposed against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks omitted).

The Sixth Circuit has not clearly answered "whether procedural due process claims are viable in voting rights cases outside the *Anderson-Burdick* framework." *League of Women Voters of Ohio v. LaRose*, No. 2:20-CV-3843, 2020 WL 5757453, at *12 (S.D. Ohio Sept. 27, 2020) (determining that such procedural due process claims were viable and analyzing claim under *Mathews*); *see also New Georgia Project v. Raffensperger*, No. 20-13360-D, --- F.3d ----, 2020 WL 5877588, at *3 (11th Cir. Oct. 2, 2020) (rejecting the application of *Mathews* to voting laws as doing so "would stretch concepts of due process to their breaking point"). While *Obama for America* announced a "single standard for evaluating challenges to voting restrictions," that case did not specifically address procedural due process claims. *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). In another voting rights case, this court considered the plaintiffs' procedural due process claim without suggesting that such a claim lacks viability outside *Anderson-Burdick*. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 637 (6th Cir. 2016); *see also Schmitt v. LaRose*, 933 F.3d 628, 642 (6th Cir. 2019) (same). Given our

conclusion that we lack standing to hear this case, we do not now resolve the question of whether *Anderson-Burdick*'s "single standard" encompasses procedural due process claims, and we mention it only to highlight the ongoing uncertainty in this circuit regarding the viability of these claims.

But regardless of whether *Anderson-Burdick* governs the plaintiffs' procedural due process claim, it certainly governs their claim that the signature verification procedure violates the fundamental right to vote. On that claim, the plaintiffs contend that the burdens imposed on their members' right to vote are substantial because they could result in ballots being improperly rejected and votes not being counted. *See Mays*, 951 F.3d at 784 ("Under *Anderson-Burdick*, we first look to the burden the State's regulation imposes on the right to vote."). Plaintiffs also believe that the State's interests in maintaining its current procedure are low because the State's current procedure actually diminish election integrity. *See Mays*, 951 F.3d at 784 (discussing the second element of the *Anderson-Burdick* test which weighs the State's interest against the burden on voting). The defendants, in contrast, claim that the current procedure imposes a minimal burden on the right to vote because voters have methods of ensuring that their ballots will be counted, such as casting a provisional ballot, and the state's interest in preventing election fraud and promoting finality is high.

Determining whether a violation of the fundamental right to vote is likely to occur under *Anderson-Burdick* involves careful balancing of the burden on the voters with the state's legitimate interests. Given that we have already concluded that the plaintiffs likely lack standing to pursue their claims, we need not engage in that balancing here.

**C.**

Finally, we note, briefly, that the plaintiffs have also failed to demonstrate that they are likely to suffer irreparable harm. Irreparable harm is an "indispensable" requirement for a preliminary injunction, and "even the strongest showing" on the other factors cannot justify a preliminary injunction if there is no "imminent and irreparable injury." *D.T. v. Summer Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* at 327 (quoting *Michigan*

*Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). "A restriction of the fundamental right to vote . . . constitutes irreparable injury." *Obama for Am.*, 697 F.3d at 436.

Our focus during our inquiry into irreparable harm "is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of S.E. Pennsylvania v. Casey*, 505 U.S. 833, 894 (1992)). If a ballot is improperly rejected and the voter has no ability to cure that rejection, that might amount to a restriction of a constitutional right. But, as we discussed during our analysis of whether the plaintiffs have standing, the plaintiffs are not facing a certain and immediate risk of harm. The plaintiffs have not presented any evidence that demonstrates that members of their organizations are likely to have their ballots erroneously rejected under the current procedures. And the plaintiffs have not demonstrated that anyone whose ballot may be erroneously rejected will ultimately be unable to cast a ballot, either absentee or by provisional ballot. Therefore, there is no evidence that anyone's constitutional rights are likely to be infringed by the Tennessee procedures. For that reason, the plaintiffs cannot show that they will be irreparably harmed if they are not issued a preliminary injunction.

## III.

For these reasons, we **AFFIRM** the district court's denial of a preliminary injunction.

—————————

**DISSENT**

—————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Make no mistake:  today's majority opinion is yet another chapter in the concentrated effort to restrict the vote.  *See, e.g.*, *Raysor v. DeSantis*, 140 S. Ct. 2600 (2020) (mem.); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020); *Democratic Nat'l Comm. v. Bostelmann*, --- F.3d ----, 2020 WL 5951359 (7th Cir. 2020) (per curiam); *New Ga. Project v. Raffensperger*, --- F.3d ----, 2020 WL 5877588 (11th Cir. 2020); *A. Philip Randolph Institute of Ohio v. LaRose*, --- F. App'x ----, 2020 WL 6013117 (6th Cir. 2020); *see generally* Richard L. Hasen, *The 2016 U.S. Voting Wars: From Bad to Worse*, 26 Wm. & Mary Bill Rights J. 629 (2018).  To be sure, it does not cast itself as such—invoking instead the disinterested language of justiciability—but this only makes today's majority opinion more troubling.  As a result of today's decision, Tennessee is free to—and will—disenfranchise hundreds, if not thousands of its citizens who cast their votes absentee by mail.  Masking today's outcome in standing doctrine obscures that result, but that makes it all the more disquieting.  I will not be a party to this passive sanctioning of disenfranchisement.  I dissent.

**I.**

To read the majority opinion, you would be forgiven for thinking that there was no question that Plaintiffs likely lack standing to pursue their constitutional claims.  The majority crafts this illusion by misapplying inapposite authority, glossing over binding case law, and torturing the evidentiary record.  In doing so, it sets a dangerous precedent of its own that will doubtless close the courthouse door to litigants, like Plaintiffs, seeking nothing more than to ensure that their votes are counted.  That result strikes at the core of our democratic system.  As the Supreme Court said in *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964):

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

The majority has abdicated this fundamental duty by conjuring up fictional barriers at the threshold that allow them to turn a blind eye to the merits. Their justifications for doing so are feeble.

A plaintiff's likelihood of success on the merits "'necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that plaintiff has standing.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring in part) (original emphasis)). Thus, for a preliminary injunction to issue, Plaintiffs must demonstrate a likelihood of at least one of them establishing standing. *See id.*; *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006) ("one party with standing is sufficient to satisfy Article III's case-or-controversy requirement"); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir. 2016) ("When one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable."). Plaintiffs here have done so.

The foundational elements of standing are well established: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "An injury, for standing purposes, means the 'invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent."'" *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). In the context of a claim for injunctive or declaratory relief, the plaintiff must demonstrate that they are "subject to 'actual present harm or a significant possibility of future harm.'" *Grendell v. Ohio S. Ct.*, 252 F.3d 828, 833 (6th Cir. 2001) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).

At its core, "[t]he purpose of the standing doctrine is to ensure that courts do not render advisory opinions rather than resolve genuine controversies between adverse parties." *Lujan*, 504 U.S. at 598 n.4 (Blackmun, J., dissenting); *Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 303 (6th Cir. 2019) ("The standing requirement prevents federal courts from issuing advisory

opinions."). This limit on judicial power is said to ensure that the courts do not overstep the separation of powers, *see Chapman*, 940 F.3d at 303–04, and that the courts render decisions with the benefit of argument that has been tested by the crucible of truly adversarial proceedings, *see United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

Decisional law recognizes that organizational plaintiffs are no less able to demonstrate standing than individuals. Indeed, an organization has two avenues for establishing that they have standing to sue: "(1) on its own behalf because it has suffered a palpable injury as a result of the defendants' actions; or (2) as the representative of its members." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002). Plaintiffs contend that they can demonstrate a likelihood of establishing standing under either avenue. I agree.

## A.

To begin with, I believe that Plaintiffs have demonstrated a likelihood that they have standing as representatives of their members. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The only question in dispute here is whether any of Plaintiffs' members would likely have standing to sue in their own right—Defendants do not contend that the issue falls outside of Plaintiffs' organizational purposes or that the suit requires individual members' participation (nor could they).

Defendants' argument boils down to this: Plaintiffs do not have standing to sue on behalf of their members because they have failed to—indeed, cannot—identify a *specific* member who would have standing to sue in their own right. But, in these circumstances, Plaintiffs were required to do no such thing. That is because we do not require organizational plaintiffs to specify members who would themselves have standing where the injury in question could not be "specifically identified in advance." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d

565, 574 (6th Cir. 2004) (per curiam); *see also Block Commc'ns, Inc. v. F.C.C.*, 808 F. App'x 332, 336 (6th Cir. 2020). In other words, where an organizational plaintiff seeking to establish standing to sue as a representative of its members could not identify the specific member that will be harmed due to the nature of the injury, this court does not hold them to an impossible standard—it is enough to demonstrate that at least one of their members will likely suffer the injury. *See Sandusky*, 387 F.3d at 573–74. Here, Plaintiffs cannot know which of their members' absentee ballots will be rejected until election day, and thus they cannot identify the injury that will occur with the level of specificity that Defendants demand and the majority implicitly requires. But under this court's precedent, that is not an insurmountable barrier.

This doctrine is typified by *Sandusky*, a case to which the majority barely pays lip service. In *Sandusky*, a panel of this court considered a challenge to Ohio's provisional ballot system brought by various political groups and labor unions. 387 F.3d at 570–71. The challenge arose under the Help America Vote Act ("HAVA"), which protected voters from being mistakenly turned away from their polling place by "creating a system for provisional balloting, that is, a system under which a ballot would be submitted on election day but counted if and only if the person was later determined to have been entitled to vote." *Id.* at 569. The crux of the plaintiffs' claim was that Ohio's provisional ballot system failed to live up to the promises of HAVA because it limited the availability of provisional ballots and "unduly limit[ed] the circumstances in which a provisional ballot [would] be counted as a valid ballot." *Id.* at 571. In particular, the plaintiffs argued that under Ohio's provisional ballot system, a poll worker could withhold a provisional ballot from a would-be voter based on a mistaken, on-the-spot determination that the voter was not a resident of the precinct, in violation of HAVA's protections. *Id.* In short, like Plaintiffs here, the plaintiffs in *Sandusky* brought suit to protect against the risk of human error inherent in a state's election laws.

Acknowledging that the plaintiffs had not identified specific members "who will seek to vote at a polling place that will be deemed wrong by election workers," the *Sandusky* panel nevertheless concluded the organizational plaintiffs had standing to pursue their claim. *Id.* at 574. The panel explained its reasoning thus:

> Appellees have not identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers, but this is understandable; by their nature, mistakes cannot be specifically identified in advance. Thus, a voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is inevitable, however, that there will be such mistakes. The issues [that the organizational plaintiffs] raise are not speculative or remote; they are real and imminent.

*Id.* To the *Sandusky* panel, then, the touchstone for representative organizational standing was not the identification of a specific member who was sure to be denied a provisional ballot. Instead, under *Sandusky*, in cases where the injury cannot be "specifically identified in advance," it is enough for a plaintiff organization to demonstrate that mistakes are certain to occur and that at least some of the organization's members will be affected. *See id.* Especially in the context of suits involving elections, this rule makes good sense. Forcing plaintiffs to wait until they (or their members) have been denied the opportunity to vote on election day would preclude any meaningful relief because there is no casting a new ballot once the election is over. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law."). Yet that is the outcome the majority effectively endorses today.

Applying *Sandusky* to the matter at hand, Plaintiffs have established a likelihood that some of their members will have their ballots erroneously rejected, and that is the most that this court's precedent requires. *See Sandusky* 387 F.3d at 574. In particular, Plaintiffs have pointed to evidence that the most recent reported rejection rate for absentee ballots due to perceived signature invalidity is 0.09% and have offered unrefuted evidence that many of those rejections are highly likely to be erroneous due to the inadequate training that election officials receive. R. 40-4 (Mohammed Decl. I at ¶¶ 21–23, 28–37) (Page ID #1535–45); R. 54-7 (Mohammed Decl. II at ¶¶ 4–6) (Page ID #2312); *see also* R. 46-1 (Goins Decl. at ¶¶ 29–30) (Page ID #1832). This rejection rate—to the extent it was accurate in the first place, *see* R. 43 (Mot. for Prelim. Inj. at 11 n.12) (Page ID #1669) (noting rejection rate was not reported for all Tennessee counties and that not all absentee ballots were accounted for)—is likely to be significantly higher this year due

to time pressures caused by the dramatic increase in the use of absentee ballots that Tennessee expects. R. 54-7 (Mohammed Decl. II at ¶ 3) (Page ID #2312). And for Plaintiffs' members, many of whom fall within groups that are more likely to have benign signature variations due to factors like their age, the rejection rate may be higher still. *See* R. 40-4 (Mohammed Decl. I at ¶¶ 21–23, 30–37) (Page ID #1535–45); R. 40-5 (Tennessee NAACP Decl. at ¶ 16) (Page ID #1556). Setting that aside, even assuming a 0.09% rejection rate—which is generous—for the 2020 General Election, it is highly likely that some of Plaintiffs' members will be among the Tennessee voters who will suffer an erroneous rejection for perceived signature invalidity in November if Tennessee's signature verification procedure is left in place.[1] That is all this court requires of Plaintiffs in these circumstances. *See Sandusky*, 387 F.3d at 574.[2]

---

[1]Plaintiffs count at least 30,000 members between them. *See* R. 40-6 (MCLC Decl. at ¶ 4) (Page ID #1568 (20,000 members); R. 40-5 (Tennessee NAACP Decl. at ¶ 11) (Page ID #1556) (10,000 members). Assuming one third of those members (10,000) will vote absentee by mail, then it is reasonably likely somewhere around nine of Plaintiffs' members will have their ballots rejected for signature invalidity. At least some of those rejections are likely to be erroneous according to the unrefuted opinion of Plaintiffs' expert, who opined that untrained comparisons are highly likely to result in erroneous rejections. R. 40-4 (Mohammed Decl. I at ¶¶ 21–23, 28–37) (Page ID #1535–45); R. 54-7 (Mohammed Decl. II at ¶¶ 4–6) (Page ID #2312). I chose this rough one-third estimate based on Tennessee's own evidence that over 30% of the state's registered voters are over the age of sixty, thus qualify to vote absentee, Tenn. Code § 2-6-201(5)(A), and have a strong incentive to do so. *See* R. 40-2 (Doshi Decl., Ex. 4 at 46) (Page ID #260). Of course, not all of those individuals will vote absentee by mail. But the 30% number represents just one of the nine classes (not to mention further sub-classes) of Tennesseans who are statutorily eligible to vote absentee by mail, including the significant-but-unknown number of Tennesseans who qualify under the new interpretation rendering those at high risk for COVID-19 and their caretakers eligible to vote absentee by mail. *See* Tenn. Code § 2-6-201; *Fisher v. Hargett*, 604 S.W.3d 381, 385 (Tenn. 2020). Thus, I think the one-third estimate is fair, especially considering that Plaintiffs have offered evidence suggesting that their members qualify to vote absentee by mail at a higher rate than Tennessee generally. In any case, even if I cut my estimate in half, and assumed that 5,000 of Plaintiffs' members will vote absentee by mail, it would not change my conclusion that Plaintiffs are likely to establish that at least some of their members will suffer an erroneous absentee ballot rejection on account of perceived signature invalidity.

[2]The Supreme Court has not since limited this principle, as Defendants assert. In *Summers v. Earth Island Institute*, the case Defendants point to as abrogating *Sandusky*, the Supreme Court faulted an environmental organization for failing to identify a specific member who would be injured by the application of the regulation in question to particular national forests. *See* 555 U.S. 488, 494–95 (2009). But there, the organization had a straightforward way to identify specific members who would be injured by the regulation—offering evidence that the member intended to visit the impacted forests. *See id.* Here, in contrast, there is no dispute that a significant proportion of Plaintiffs' membership will vote, there is simply the unanswerable question as to which of them will have their ballots erroneously rejected. *Summers*, accordingly, is no bar. *See also Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.") (distinguishing *Summers*).

In order to avoid *Sandusky*, the majority resorts to a lame attack on the evidence supporting Plaintiffs' position and two inapplicable cases, namely, *Lyons*, 461 U.S. 95, and *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977 (6th Cir. 2020) (per curiam), *cert. denied*, --- S. Ct. ----, 2020 WL 5882333 (2020). On the evidentiary front, the majority decries as speculative Plaintiffs' conclusion that Tennessee election officials will erroneously reject at least some of their members' absentee ballots due to perceived signature invalidity. The majority even goes so far as to conclude that "it is far from inevitable that an absentee ballot will be incorrectly rejected for inconsistent signature" at all. Maj. Op. at 10. What appears to be motivating the majority's reasoning is the absence of evidence of specific voters who have had their absentee ballots erroneously rejected. Indeed, the majority bemoans Plaintiffs' failure to "cite any official data to support their theory that some of the absentee ballots will be incorrectly rejected" or to point to a member who "has had an absentee ballot erroneously rejected in the past." Maj. Op. at 10. But the absence of evidence is not evidence of absence, and Plaintiffs have offered a more than adequate alternative in the expert opinions of Dr. Linton A. Mohammed, a certified Forensic Document Examiner ("FDE") with impeccable credentials. R. 40-4 (Mohammed Decl. I at ¶ 1) (Page ID #1530).

Dr. Mohammed set forth a comprehensive analysis of the risk of error inherent in signature verification, explaining that even highly trained FDEs will erroneously conclude that a signature is non-genuine. *See id.* at ¶ 46 Page ID #1550). Indeed, in one study referenced by Dr. Mohammed, FDEs erroneously concluded that signatures were non-genuine at a rate of 7.05%. *Id.* at ¶ 29 (Page ID #1538–39). If FDEs—who typically receive two-to-three years of full time training—will erroneously conclude a signature is non-genuine, then it does not require any speculation whatsoever to conclude that Tennessee election officials—even with the benefit of a 45-minute video and the directives the majority recounts—will make the same error at a higher rate. *See id.* at ¶ 33 (Page ID #1541). Moreover, Dr. Mohammed identified numerous features of Tennessee's signature verification program that would increase the rate of error, such as inadequate training, a lack of the requisite equipment, time pressure, a failure to screen of election officials for "form blindness," and limited comparison signatures upon which to base the conclusion that a given absentee ballot held an invalid signature. *Id.* at ¶¶ 33, 45 (Page ID #1541, 1549). In light of this, Dr. Mohammed had no trouble opining that Tennessee election

officials are "highly likely" to erroneously reject absentee ballots due to perceived signature invalidity, *id.* at ¶ 20 (Page ID #1535), going so far as to say that "Tennessee's signature matching procedures are all but guaranteed to result in the erroneous rejection of properly cast ballots," *id.* at ¶ 50 (Page ID #1551–52). To take this evidence and conclude that errors may not occur at all—as the majority does—is downright unreasonable.

In an ineffective effort to undercut Dr. Mohammed's testimony, the majority points out that Defendants offered affidavits showing that Dr. Mohammed was unaware of certain extra-statutory features of Tennessee's signature verification process when he offered his opinions. But none of Defendants' evidence—detailing the (meager) signature verification training that Tennessee election officials receive, including directives to employ a presumption favoring the validity of signatures and vague assertions that a ballot will not be rejected unless three officials deem the signature invalid—directly refuted Dr. Mohammed's opinion that when signature rejections occur, they highly likely to be erroneous. Indeed, Defendants produced no evidence suggesting what the actual rate of error for signature verification rejections might be—assuming Dr. Mohammed was incorrect—aside from a single, *unverified* case of *suspected* voter fraud. R. 46-3 (Warren Decl. at ¶ 7) (Page ID #1854). Moreover, Defendants' evidence largely affirmed that Tennessee's signature verification process lacked the features that Dr. Mohammed had originally opined would be required of a system that resulted in reliable signature verification determinations. Thus, even after reviewing Defendants' evidence, Dr. Mohammed did not change his earlier opinions. R. 54-7 (Mohammed Decl. II at ¶¶ 1–6) (Page ID #2311–12); *see also* R. 40-4 (Mohammed Decl. I at ¶ 36) (Page ID #1544) (opining that "Tennessee election officials, even if put through a short training session, are unlikely to be able to accurately account for these differences, particularly in an expedient time frame or when only one or a few specimen signatures are available for comparison."). In short, the majority's effort to downplay Dr. Mohammed's expert opinions fails. Coupled with the certainty that ballots will be rejected on the basis of a perceived signature invalidity and the historic rate for such

rejections, Dr. Mohammed's opinion renders it a certainty that erroneous rejections will happen (and will very likely happen to Plaintiffs' members).[3]

The majority takes further issue with one of Dr. Mohammed's other opinions:  that the rate of erroneous rejections due to perceived signature invalidity will increase along with the number of absentee ballots Tennessee election officials must review.  Maj. Op. at 10–11.  But as explained above, my conclusion that Plaintiffs are likely to establish standing does not depend upon that particular opinion because Plaintiffs can establish that one or more of their members will likely have their absentee ballots erroneously rejected due to perceived signature invalidity even if the historic rate of rejection remains the same.  In any case, the majority's suggestion that Dr. Mohammed is not qualified to render that particular opinion is ludicrous.  Dr. Mohammed is an accomplished researcher and academic in the field of document examination and signature authenticity in particular.  In addition to his 2019 Book, *Forensic Examination of Signatures*, he has published sixteen peer-reviewed articles in the field, many focused specifically on "the analysis of genuine, disguised, and forged signatures, and handwriting examination."  R. 40-4 (Mohammed Decl. I at ¶¶ 7, 8) (Page ID #1532–34).  Moreover, he has trained investigators, attorneys, and graduate students in document verification, and developed standards and practices regarding the same.  *Id.* at ¶¶ 4–5 (Page ID #1531–32).  Even ignoring Dr. Mohammed's other accomplishments and experience, this would more than qualify him to opine that "In my experience, the more signatures an election official has to review, the more likely they are to make mistakes, particularly when they lack adequate time in which to conduct a review."  R. 54-7 (Mohammed Decl. II at ¶ 3) (Page ID #2312).  Contrary to the majority's characterization, this opinion is based not on Dr. Mohammed's assessment of the "personal characteristics" of election officials but on the conditions under which the election officials must perform their duties—and in particular the insufficient time the election officials would have to examine the signatures in question.  *Id.*; R. 40-4 (Mohammed Decl. I at ¶ 25) (Page ID #1536–37) (opining that "because a minimum of two hours is required to accurately compare signatures, election officials with

---

[3]The majority suggests—citing no authority—that the only injury that would satisfy the standing inquiry would be the state's wholesale denial of a member's ability to vote.  *See* Maj. Op. at 11.  Nonsense.  The erroneous rejection of a validly cast absentee ballot is plainly a concrete, particularized, and actual or imminent injury sufficient to demonstrate standing.

insufficient time to evaluate the signature on the ballot return envelope are likely to make additional errors"); R. 46-1 (Goins Decl. at ¶ 9) (Page ID #1826) (anticipating delays in counting absentee ballots due to significant increase in volume received). Dr. Mohammed was qualified to offer that opinion, even though Plaintiffs' standing argument does not depend on it.

As for the two cases the majority relies on, they do not compel its strained conclusion, which is contrary to this court's binding precedent in *Sandusky*. First, the majority points to *Lyons*, where the Supreme Court rejected, on standing grounds, a suit that sought to enjoin the Los Angeles Police Department ("LAPD") from employing the use of chokeholds. 461 U.S. at 97–98. Specifically, the Court concluded that the plaintiff's allegation that the LAPD sometimes used chokeholds in the course of policing (including in the past on plaintiff himself) did not establish an injury that was sufficiently imminent. *Id.* at 105. In other words, the plaintiff failed to demonstrate that he was likely to once again have a chokehold used upon him in the future as would be required to seek injunctive relief. *Id.* But *Lyons* involved an individual plaintiff, not organizations like Plaintiffs, and this distinction is fatal to the majority's reasoning. Although evidence of the LAPD's regular use of chokeholds would not establish a likelihood that it will employ a chokehold on a given individual, that same evidence *could* establish that the LAPD will employ a chokehold in an interaction with a plaintiff organization's members, so long as the membership was large enough relative to the rate at which the LAPD employed chokeholds. In the language of *Sandusky*, such an organizational plaintiff could not "know in advance" the member who would find themselves on the receiving end of an LAPD chokehold, but it could demonstrate the inevitability of such an interaction taking place. *Sandusky*, 387 F.3d at 574. *Lyons* is of no consequence here.[4]

Second, the majority relies on *Shelby Advocates*. But that case serves only to underscore the applicability of *Sandusky* and the sufficiency of Plaintiffs' asserted injury. In *Shelby*

---

[4]The majority faults Plaintiffs for failing to present evidence that one of their members has had their absentee ballot erroneously rejected in the past, analogizing to the plaintiff in *Lyons*, who had presented that evidence the LAPD had previously used a chokehold on him in the past. Maj. Op. at 11–12. The majority's suggestion is that a plaintiff cannot have standing to seeking forward-looking injunctive relief unless they have suffered a past injury. This is absurd. Nothing in the law of standing—which allows suits seeking injunctive relief upon a showing of an "imminent" injury and the possibility of "future harm"—supports the majority's careless suggestion. *See Grendell*, 252 F.3d at 833.

*Advocates*, the plaintiffs, including at least one organization, contended that the past occurrence of election administration issues—"system vulnerabilities, previous equipment malfunctions, and past election mistakes"—created a future risk of vote denial that was sufficient to constitute an injury in fact. 947 F.3d at 981. The panel rejected this theory as lacking the requisite imminence. *See id.* at 981–83. But in doing so, the panel specifically took the time to distinguish *Sandusky*:

> In *Sandusky*, the challenged policy . . . made it "inevitable" that the defendants would deny individuals their voting rights. Here, by contrast, plaintiffs allege only policies that add risk to the ever present possibility that an election worker will make a mistake. No injury may occur at all. Any analogy to *Sandusky* falls short.

*Id.* at 983. As explained at length above, Plaintiffs *have* established the inevitability of erroneous absentee ballot rejections due to perceived signature issues, and they have further demonstrated a significant likelihood that their members will be among the ones inevitably affected. Accordingly, *Shelby Advocates* does not control the outcome of this case.

In sum, the majority's analysis of Plaintiffs' standing to represent the interests of its members is flawed in numerous respects—misconstruing the evidence and the law in a misguided effort to affirm the denial of a preliminary injunction. I have no doubt that Plaintiffs have a "'personal stake in the outcome'" that "'assure[s] that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *Lyons*, 461 U.S. at 101 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). By concluding that Plaintiffs likely have not demonstrated such an interest, the majority has assured there will be no timely resolution of Plaintiffs' constitutional questions, let alone a proper one. Such a resolution would not have been a mere advisory opinion, undermining the separation of powers. It would have been the resolution of a genuine constitutional controversy, central to this court's fundamental role—one with hundreds if not thousands of legitimate votes in the balance.

**B.**

I would also conclude that Plaintiffs are likely to establish direct organizational standing to pursue their constitutional claims. To demonstrate direct organizational standing, a plaintiff organization must show that it suffered a "palpable injury as a result of the defendants' actions."

*MX Group*, 293 F.3d at 333.  To do so, Plaintiffs point to various changes made to their operations, activities, and expenditures to account for and protect against Tennessee's signature verification process.

Plaintiffs' direct organizational standing argument turns on this court's decision in *Coalition for the Homeless*, 837 F.3d 612.  In that case, the organizational plaintiffs—including an advocacy organization that conducted voter outreach for persons without homes—brought suit to enjoin two newly enacted Ohio laws that, among other things:

> (1) required county boards of elections to reject the ballots of absentee voters and provisional voters whose identification envelopes or affirmation forms, respectively, contain an address or birthdate that does not perfectly match voting records; [and] (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and provisional voters to present valid identification, from ten to seven . . . .

*Id.* at 618, 624.  The defendants argued that the organizational plaintiffs' asserted injury, which stemmed from actions undertaken in response to the changes in the law, was insufficient to establish direct organizational standing.  *Id.* at 624.  The panel disagreed, reasoning that the change in law triggered a comprehensive shift in the advocacy organization's voter outreach sufficient to establish an injury in fact; before the new laws the organization had focused its outreach efforts towards encouraging homeless individuals to vote early in-person, whereas after the shift in the law occurred the organization had focused its outreach efforts on encouraging homeless individuals to vote by mail.  *Id.*  This represented "an overhaul of the get-out-the-vote strategy of an organization that uses its limited resources helping homeless voters cast ballots" requiring "more volunteers, time, and expenditures" that went beyond "the 'effort and expense' associated with advising voters how to 'comport' with the law," which alone would have been insufficient to establish an injury in fact.  *Id.* (quoting *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014)).

Here, organizational plaintiffs have offered evidence of a similar overhaul in their outreach and advocacy activities sufficient to constitute an injury in fact for standing purposes. Take, for example Plaintiff Equity Alliance, a "grassroots advocacy group that seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action

on issues affecting their daily lives." R. 40-8 (Equity Alliance Decl. at ¶ 5) (Page ID #1585). This year, Equity Alliance has redirected significant time, effort, and resources towards absentee voting advocacy in Tennessee, which previously was not a focus for the organization due to the high rate of in-person voting in the state prior to the COVID-19 pandemic. *Id.* (¶ 23–25) (Page ID #1588). This shift in focus includes plans to dedicate the organization's limited resources to voter outreach regarding Tennessee's signature verification process. *Id.* (¶¶ 40–41) (Page ID #1591). The other organizational plaintiffs have demonstrated similar overhauls of their advocacy and outreach activities in response to the expected surge in absentee voting due to the COVID-19 pandemic, including efforts specifically targeting signature verification. *See* R. 40-7 (APRI Decl. at ¶¶ 27–30) (Page ID #1580) (prior to this year, efforts focused on encouraging in-person voting, but have shifted to absentee voting, including informing voters about signature verification issues); R. 40-6 (MCLC Decl. at ¶¶ 17–19, 27–29) (Page ID #1570–72) (diverted resources from in-person voting initiatives towards absentee voter outreach including informing voters about the signature verification process and how to avoid erroneous rejections); R. 40-5 (Tennessee NAACP Decl. at ¶¶ 41–46, 56–66) (Page ID #1561–64) (shifted outreach to focus on absentee voting, including efforts directed towards signature verification); R. 40-9 (Free Hearts Decl. at ¶¶ 14–15, 27–31) (Page ID #1597, 1599–1600) (to the same effect). These efforts have gone beyond simply informing constituents about how to comply with absentee voter laws, to include activities that encourage voters to practice their signatures in order to avoid erroneous rejections and to proactively reach out to election officials to ensure their absentee ballot has been accepted. *See, e.g.*, R. 40-5 (Tennessee NAACP Decl. at ¶¶ 61–63) (Page ID #1564). These injuries are fairly traceable to Tennessee's signature verification procedures and would be redressed by a favorable judicial outcome because, if Plaintiffs obtained their desired injunction, they could redirect the resources currently being expended on signature verification efforts to other initiatives. *See, e.g.*, *id.* (¶ 66) (Page ID #1564).

Defendants raise a distinction between *Coalition for the Homeless* and this case. Specifically, they point out that unlike in *Coalition for the Homeless*, where the organizational plaintiff's shift in organizational strategy resulted from newly enacted laws, Tennessee's absentee voting laws are "hardly new." Appellees' Br. at 32. I acknowledge that the newly enacted status of the Ohio laws at issue in *Coalition for the Homeless* was a factor considered by

that panel, but I do not believe that renders the case inapplicable here. That is because *Coalition for the Homeless* does not stand for the proposition that challenges to newly enacted laws and *only* challenges to newly elected laws can result in a cognizable injury for the purposes of direct organizational standing in cases involving state-law challenges. The case does not purport to make such an all-encompassing pronouncement that would hamstring countless legitimate lawsuits, and indeed, if it did so purport, that would be dicta. At most, the case stands for the proposition that some sort of change in circumstances must have led to an organizational plaintiff redirecting its efforts in some fashion. That could result from a change in the law, but it could also result from any number of other things. The recent change in circumstances resulting from the COVID-19 pandemic identified by the organizational plaintiffs here suffices to meet such a standard, to the extent *Coalition for the Homeless* calls for it.

But I do not think that *Coalition for the Homeless* stands for even that much. The upshot of that case is that an organization must establish that it has changed or will change its activities in some fashion to address the challenged law—it cannot rely on insignificant changes to activities that it was already conducting. I glean this from the context in which the panel in *Coalition for the Homeless* invoked the newly enacted status of the Ohio laws at issue, which was in distinguishing the case from an earlier decision of this court, *Fair Elections Ohio*, 770 F.3d 456. *See Coalition for the Homeless*, 837 F.3d at 624. *Fair Elections Ohio*, another elections case, involved a significantly less robust claim of injury. In essence, the organizational plaintiff there claimed that it suffered an injury in fact sufficient to challenge "years-old" absentee ballot procedures based on the fact that it needed to make changes to the content of its volunteer trainings to account for the laws. *Fair Elections Ohio*, 770 F.3d at 459–60. But the organizational plaintiff had conceded it would already be providing broadly similar trainings at already-scheduled meetings. *See id.* Thus, there were no changes of any meaningful significance to the organization's activities upon which to base the finding of an injury in fact.

In this context, the panel's invocation in *Coalition for the Homeless* of the newly enacted status of the Ohio laws at issue is best understood as a helpful explanation for why the organizational plaintiffs in that case stood on different footing rather than the articulation of a new limitation on direct organizational standing. Whereas in *Fair Elections Ohio* the

organization claimed an injury on the basis of substantially similar pre-existing activities, in *Coalition for the Homeless* the organizations claimed standing on the basis of overhauled operations due to a change in the law. Read together, these cases stand for the uncontroversial position that an organization may not manufacture standing from its pre-existing work, but must demonstrate a significant shift in their operations, activities, or strategies. *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) ("That is not to say that organizations have standing based solely on the baseline work they are already doing. They 'cannot convert [ ] ordinary program costs into an injury in fact.' The question is what additional or new burdens are created by the law the organization is challenging. It must show that the disruption is real and its response is warranted.") (internal citations omitted) (original alterations). As explained above, Plaintiffs have made an adequate showing of that here.

The majority's only retort to this argument is to repeat its assertion that there is no imminent threat that Plaintiffs' members' absentee ballots will be erroneously rejected, which would justify Plaintiffs' overhauls and expenditures. For the reasons explained above, that false premise cannot support the majority's conclusion that Plaintiffs are unlikely to establish direct organizational standing any more than it can support the majority's conclusion that Plaintiffs are unlikely to establish standing as representatives of their members. Indeed, Plaintiffs have demonstrated a likelihood of establishing standing under either avenue. Accordingly, I would resolve the question of whether Plaintiffs are likely to succeed on the merits of their constitutional claims—a question the majority so eagerly has avoided.[5]

## II.

For the first time on appeal, Defendants argue that this court should apply the same analytical framework to address both of Plaintiffs' constitutional claims. Specifically, Defendants contend that this court should eschew the typical procedural due process analysis—characterized by a two-step inquiry and balancing test the Supreme Court articulated in *Mathews*

---

[5]Commensurate with the brevity of Defendants' argument that Plaintiffs lack prudential standing, I will briefly address it here. Given that Plaintiffs are asserting the rights of their members, they have plainly established a "close relationship" justifying their bringing suit. *Cf. Fair Elections Ohio*, 770 F.3d at 461. This court routinely allows organizations to proceed in cases such as these. *See, e.g.*, *Sandusky*, 387 F.3d at 574.

*v. Eldridge*, 424 U.S. 319 (1976)—in favor of the standard applicable to allegations that a state law unduly burdens various constitutional rights involving elections—another balancing test set forth by the Supreme Court, but this time in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). According to Defendants, renouncing *Mathews* in favor of *Anderson-Burdick* is appropriate because *Anderson-Burdick* is the framework for analyzing *every* constitutional challenge to a state election law, regardless of whether that claim sounds in procedural due process, equal protection, or the fundamental right to vote. I disagree.

To begin, our precedent rejects Defendants' position—a point the majority neglects to mention in unhelpfully noting the existence of these two constitutional tests but nothing further.[6] Take, for example, *Miller v. Lorain County Board of Elections*, where a panel of this court addressed the constitutionality of an Ohio ballot access law, which required an independent congressional candidate to "file a nominating petition that contains valid signatures of at least one percent of qualified electors voting in the last gubernatorial election who reside within the district . . . where the election is to be held" in order to be placed on the ballot. 141 F.3d 252, 254 (6th Cir. 1998). The panel applied *Anderson-Burdick* to conclude that the ballot access law did not offend the First and Fourteenth Amendments' guarantees of freedom of speech and association and the Fourteenth Amendment's equal protection guarantees, *id.* at 256–59, but applied the standard due process analysis to determine that the state had provided the plaintiff constitutionally sound procedures for challenging the state's determination that 386 of the signatures he produced were invalid, *id.* at 259–60. And in *Schmitt v. LaRose*, a panel of this court applied *Anderson-Burdick* to determine whether Ohio's ballot-initiative laws imposed an impermissible prior restraint on the plaintiffs' political speech in violation of the First and Fourteenth Amendments, 933 F.3d 628, 639 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2803 (2020), but applied the standard due process analysis to determine whether the state afforded

---

[6]Noting that there was no need to carry on after their conclusion that Plaintiffs "failed to show a substantial likelihood of establishing standing," the majority nevertheless offers musings on a few merits issues under the guise of "provid[ing] limited commentary to guide the district court in the ultimate resolution of various issues in this case." Maj. Op. at 13. The question of which standard to apply to Plaintiffs' procedural due process claim is one of those the majority deigned to pass upon, although its musings on this question are particularly lackluster. The majority simply notes the existence of the two tests and informs the district court it will need to choose between them. Maj. Op. at 13–15. This does nothing to "guide" the district court—it is the equivalent of directions that tell you that there is a fork in the road but not which prong to take.

aggrieved proponents of a ballot initiative adequate procedures to challenge a decision to leave their initiative off the ballot, *id.* at 642.

To be sure, as Defendants point out, our precedent also broadly states that *Anderson-Burdick* is "a single standard for evaluating challenges to voting restrictions." *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). Indeed, we have applied *Anderson-Burdick* in analyzing challenges alleging that a state's deadline for requesting an absentee ballot impermissibly infringes upon the right to vote protected by the First and Fourteenth Amendments, *Mays v. LaRose*, 951 F.3d 775, 791–92 (6th Cir. 2020), ballot access laws like the one at issue in *Miller*, and even equal protection claims alleging disparate treatment of voters, *Obama for Am.*, 697 F.3d at 428–30; *but see Mays*, 951 F.3d at 783 n.4 (dicta expressing doubt as to whether *Anderson-Burdick* properly applies to all equal protection challenges involving state election laws). But it does not follow from the application of *Anderson-Burdick* in those contexts that it should also be applied to Plaintiffs' procedural due process claim here. That is because a procedural due process claim is different in kind from the other sorts of constitutional claims that a plaintiff might bring to challenge a state election law, which are fundamentally substantive in nature.

The typical constitutional challenge to a state election law is an effort to vindicate a substantive right. For example, as in *Miller*, an independent candidate for Congress might argue that requiring that they obtain a certain number of signatures before they can appear on a ballot violates their rights to freedom of speech and political association protected by the First and Fourteenth Amendments. The gravamen of the claim is that the Constitution outright forbids the challenged conduct of the state: in the example, imposing the signature requirement as constituted. Put differently, the allegation is that the state's conduct is constitutionally "wrongful," however it goes about undertaking it. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

Procedural due process claims are different. The gravamen of a procedural due process claim is not that the government's conduct—in the procedural due process context, the deprivation of liberty or property—is constitutionally prohibited of its own accord, but that the state's procedures do not adequately protect against mistaken, unjustified, or erroneous

deprivations.  *See Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken* or *unjustified* deprivation of life, liberty, or property.") (emphasis added).  To continue the example based on *Miller*, the independent candidate might argue that even if the state may impose the signature requirement at issue, the state failed to provide adequate procedures by which the candidate could challenge the state's determination that the signatures that the candidate provided were invalid (say, because they came from outside the electoral district), in violation of their procedural due process rights.  Simply put, in the procedural due process context, the inquiry turns on procedure, not substance.  *See Zinermon*, 494 U.S. at 125 ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.") (original emphasis).

*Miller* and cases like it, which apply *Anderson-Burdick* to substantive constitutional challenges to state election laws but apply the usual procedural due process analysis to related procedural due process claims, appropriately preserve the conceptual distinction between these two kinds of challenges.  Doing so is important because those two tests are carefully calibrated to vindicate substantive and procedural rights respectively.  On the one hand, the *Anderson-Burdick* standard is classically substantive, balancing the state's justification for regulating an election in a particular way against the burden that regulation places on a substantive right.  *Compare Burdick*, 504 U.S. at 434 ("A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'") (quoting *Anderson*, 460 U.S. at 789), *with Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (analyzing First Amendment challenge to speech regulation by applying strict scrutiny, which asks whether the statute "serve[s] a compelling state interest"); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 693 (6th Cir. 2016) (analyzing Second Amendment challenge to firearm restriction by applying intermediate scrutiny, which asks whether the government's objective is "'significant, substantial, or important'") (quoting *United*

*States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013)). *See also* Erwin Chemerinsky, *Substantive Due Process*, 15 Touro L. Rev. 1501, 1501 (1999) ("Substantive due process looks to whether there is a sufficient substantive justification, a good enough reason for such a deprivation [of life, liberty, or property]."). On the other hand, procedural due process analysis has an unsurprisingly procedural bent, turning on the risk of error inherent in the established procedural regime and the burden that imposing additional procedures would place on the state, among other things. *Mathews*, 424 U.S. at 335.

The standards are superficially similar—balancing factors and considering state and private interests—but differ in crucial respects. Most obviously, *Anderson-Burdick* does not expressly account for procedure. That is not to say that *Anderson-Burdick* forbids the consideration of procedure, but the standard relegates procedural inquires to the background, even where they bear on the substantive question. Moreover, these two standards do not always focus the inquiry on the same government interests. Under *Anderson-Burdick*, the inquiry centers on the state interest that justifies burdening the substantive right, *Burdick*, 504 U.S. at 434, but under *Mathews*, the inquiry turns, at least in part, on a consideration of the state's interest in avoiding more burdensome procedures, 424 U.S. at 335. This is significant, because the government's interest in imposing a given election law may justify a substantive burden in the abstract, but it does not follow that the same interest justifies imposing that burden without procedures to safeguard against erroneous applications of the requirement. Admittedly, the line between procedure and substance is blurry, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 92 (1938) ("The line between procedural and substantive law is hazy . . . .") (Reed, J., concurring in part), but I would not be so quick to obliterate entirely that line in this context by applying a substantive standard, *Anderson-Burdick*, to procedural challenges. Doing so risks negating the Constitution's procedural protections by subjugating them to a secondary role (at best) under *Anderson-Burdick*.

Defendants do not convince me otherwise. They contend that applying *Anderson-Burdick* to procedural due process challenges "respects the States' broad constitutional authority to regulate elections and its [sic] important interests in 'assur[ing] that elections are operated equitably and efficiently." Appellees' Br. at 36 (quoting *Burdick*, 504 U.S. at 433). That might

be more persuasive if this case confronted us with a choice between *Anderson-Burdick* and the unforgiving strict scrutiny standard. Indeed, as Defendants themselves recognize, "[t]he Supreme Court adopted the *Anderson-Burdick* framework as a more deferential alternative to strict scrutiny." *Id.* at 34 (citing *Burdick*, 504 U.S. at 433). But procedural due process analysis is a far cry from strict scrutiny and, as illustrated in the discussion that follows, affords Defendants a flexible standard capable of balancing their asserted interests against those asserted by Plaintiffs. In this regard, the procedural due process analysis is similar to *Anderson-Burdick*, but with the added benefit of affording procedural considerations their due.

With this discussion behind us, I will now turn to the application of these two standards. I will apply the usual procedural due process analysis to Plaintiffs' procedural due process claim. As for Plaintiffs' claim that Tennessee's signature verification requirement violates the fundamental right to vote, I will apply *Anderson-Burdick*. Ultimately, I would conclude that Plaintiffs are likely to succeed under either standard, rendering much of what I have said above somewhat academic. Nevertheless, that may not always be the case for other plaintiffs, and so it is important to lay out the reasons that support taking this path before I begin upon it.

**III.**

Plaintiffs' first challenge to Tennessee's signature verification process seeks to vindicate their members' (and Tennessee voters') procedural due process rights, which the Fourteenth Amendment protects. "The Fourteenth Amendment prohibits states from depriving individuals of life, liberty, or property without due process of law." *Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020) (citing U.S. Const. amend. XIV, § 1). Thus, the first step in analyzing a procedural due process claim is to determine "whether a liberty or property interest exists that has been interfered with by the state." *Miller*, 141 F.3d at 259. If so, at the second step of the analysis, the court must determine whether "the procedures attendant upon that deprivation were constitutionally sufficient"—i.e., whether the state has afforded due process. *Id.* The district court concluded that Plaintiffs were unable to establish a likelihood of success on the merits at the first step because their procedural due process claim failed to identify a protected interest that would trigger due process requirements. R. 77 (Mem. Op. at 21–22) (Page ID #2478–79). I

disagree and, reaching the second step of the analysis, would conclude that Plaintiffs are likely to succeed on the merits of their procedural due process claim.

**A.**

"Protected liberty interests spring from two possible sources, the due process clause itself and the laws of the state involved." *Codd v. Brown*, 949 F.2d 879, 882 (6th Cir. 1991) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Plaintiffs' primary argument is that Tennessee law establishes a liberty interest in exercising the right to vote absentee by mail and to have that vote counted. Appellants' Br. at 25. Because I agree, I would decline to rule on Plaintiffs' secondary argument: that the Constitution itself establishes a liberty interest in the absentee voting context sufficient to trigger due process requirements.

This court synthesized the standard for determining whether state law creates a protected liberty interest in *Tony L. By and Through Simpson v. Childers*:

> State-created liberty interests arise when a state places "substantive limitations on official discretion." A state substantively limits official discretion "by establishing 'substantive predicates' to govern official decisionmaking . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." The state statutes or regulations in question also must use "explicitly mandatory language" requiring a particular outcome if the articulated substantive predicates are present. Finally, the statute or regulation must require a particular substantive outcome. State-created procedural rights that do not guarantee a particular substantive outcome are not protected by the Fourteenth Amendment, even where such procedural rights are mandatory.

71 F.3d 1182, 1185 (6th Cir. 1995) (internal citations omitted) (alteration original). The absentee ballot laws at issue here fall squarely within this framework.

To begin, Tennessee law establishes substantive criteria that, if met, entitle a voter to vote absentee by mail. Tenn. Code § 2-6-201. If these predicates are met, then election officials "shall" mail the voter an absentee ballot upon receiving a proper request and "shall" deposit the absentee ballot to be counted upon receiving the ballot and concluding that the voter is entitled to vote. *Id.* § 2-6-202(b), (g). In other words, Tennessee law mandates that election officials provide absentee ballots to voters who satisfy established criteria, and mandates that those ballots be counted upon their return. *See Tony L.*, 71 F.3d at 1185. Election officials have no discretion

where the established criteria are met—the statute uses mandatory language ("shall") to dictate the voter's right to obtain and vote with an absentee ballot in these circumstances. *See id.*

Tennessee law thus goes beyond providing voters a mere "expectation of receiving a certain process," insufficient to create a liberty interest, and directs "a particular substantive outcome" with regard to a voter's right to vote absentee by mail. *See id.* at 1185–86. Tennessee voters "have an expectation that a particular result"—having their absentee ballots counted— "will follow from a particular, required action"—an official determining that they are entitled to vote absentee—that is mandated where the voter meets established substantive criteria. *See id.* at 1186 (concluding that no liberty interest is created by a statute that requires state official to take certain steps in response to reports of child abuse, but that does not mandate a particular outcome from those actions); *see also Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993) ("The Ohio victim impact law does not create a liberty interest here because it only provides that the victim has the right to be notified. The statute does not specify how the victim's statement must affect the hearing nor does it require a particular outcome based on what the victim has said."). The analysis is no more complicated than that. In these circumstances, Tennessee has created a liberty interest in voting absentee by mail sufficient to trigger due process protection.

And yet, the district court concluded otherwise. On appeal, Plaintiffs have correctly identified the two primary errors that led the district court astray. First, the district court placed undue significance on this court's decision in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008). Second, the district court relied on inapposite authority involving the liberty interests of incarcerated prisoners to conclude erroneously that only a narrow range of interests—involving freedom from restraint—qualify as state-created liberty interests for the purposes of a procedural due process analysis.

In *Brunner*, a panel of this court dealt with a complaint alleging that Ohio was "utiliz[ing] 'non-uniform rules, standards, and procedures' that result[ed] in 'massive disenfranchisement and unreasonable dilution of the vote.'" 548 F.3d at 478. The plaintiffs in that case brought equal protection, substantive due process, and procedural due process claims, seeking injunctive and declaratory relief in the face of allegations of myriad issues saturating Ohio's voting system. *Id.* at 466. When the district court denied the defendants' motion to dismiss each of these claims,

they sought and were granted interlocutory review. *Id.* at 473. On appeal, the panel affirmed the district court's ruling as to the plaintiffs' equal protection and substantive due process claims but reversed the district court as to their procedural due process claims. *Id.* at 479. In a single paragraph—reflecting the "brevity of argument" supporting the procedural due process claim—the panel remarked, without citing authority, that the plaintiffs' procedural due process claim "subsume[d] procedural due process into the substantive due process analysis" and that the plaintiff had failed to "allege[] a constitutionally protected interest." *Id.*

*Brunner* does not control the outcome of this case for at least three reasons. First, as Plaintiffs rightly point out, *Brunner* does not address the circumstances in which state law can create a liberty interest, let alone a liberty interest in voting absentee by mail under Tennessee law. Indeed, the *Brunner* plaintiffs' asserted liberty interest was simply the constitutionally protected right to vote, and they do not appear to have argued that Ohio law created a cognizable liberty interest for the purposes of procedural due process. *See id.* Cases do not stand for propositions they did not consider.

Second, unlike the procedural due process claim in *Brunner*, Plaintiffs' procedural due process claim is wholly distinct from its claim that Tennessee's absentee ballot laws burden the fundamental right to vote. In *Brunner*, the plaintiffs alleged that a litany of state practices amounted, in the aggregate, to a "fundamentally unfair" voting system in violation of their substantive due process rights. 548 F.3d at 478–79. The plaintiffs' procedural due process claim duplicated those allegations of widespread error, rather than challenging particular facets of Ohio's voting system and identifying the procedural safeguards due process requires, as would be expected of a standard procedural due process claim. *Id.* Here, in contrast, Plaintiffs have alleged and pursued a distinct procedural due process claim that targets a specific absentee voting procedure and clearly identifies the procedural safeguards that they believe due process requires.

Third, and finally, the plaintiffs in *Brunner* failed to adequately brief their procedural due process argument. *Id.* at 479. For this reason alone, *Brunner* is not controlling here, nor was it controlling on the district court below.

As for the prison litigation cases that the district court relied on, they simply do not stand for the proposition that "the kinds of interests that will be deemed 'liberty' interests in [the procedural due process] context is narrow, relating only to freedom from restraint." R. 77 (Mem. Op. at 16) (Page ID #2473). *Sandin v. Conner*, 515 U.S. 472 (1995), the case from which the district court distilled this sweeping principle, does not support the district court's conclusion. In *Sandin*, the Court addressed the standard it would apply to determine whether prison regulations created a cognizable liberty interest for the purpose of prisoners' procedural due process claims. Noting various "undesirable effects," *id.* at 482, that stemmed from cases treating mandatory language in prison regulations as establishing cognizable liberty interests for procedural due process purposes, the Court "recognize[d] that States may under certain circumstances create liberty interests which are protected by the Due Process Clause," *id.* at 483–84, but concluded that "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *id.* at 484 (citations omitted).

Thus, *Sandin* does represent a change in the legal framework for analyzing the existence of state-law created liberty interests in the context of prison regulations, shifting the inquiry from one focused on the language of the regulation (as is the case for the typical state-created interest analysis) back to one focused on the "nature of the deprivation" relative to the strictures of prison life. *See id.* at 479–82, 485–87. But *Sandin* did not purport to displace the established standard for determining whether a state law establishes a liberty interest triggering due process requirements outside of the context of prison regulations. Instead, the Court expressly limited its inquiry to "the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause." *Id.* at 474. Indeed, the Court emphasized the unique position of prison litigation, reiterating its view that in the context of prisoner litigation "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* at 482. Moreover, the considerations that motivated the Court—a desire to avoid "disincentives for States to codify prison management procedures" while affording state officials the flexibility to "fine-tun[e] . . . the ordinary incidents of prison life"—have no bearing when considering procedural due process claims that do not involve

prison regulations or incarcerated prisoners. *Id.* at 482–83. The Court recognized as much, remarking that a focus on mandatory language "may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public" but that "[i]t is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison." *Id.* at 481–82.

Although this court has embraced *Sandin* in the context of prisoner litigation, it has done so while reiterating the same unique concerns implicated by prisoner litigation that motivated the Court in *Sandin*. *See Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005) ("In evaluating a claimed liberty interest by prison inmates, courts are mindful that imprisonment necessarily 'carries with it the circumscription or loss of many significant rights.'") (quoting *Hudson v. Palmer*, 468 U.S. 517, 524 (1984)). Indeed, this court has tacitly rejected the applicability of *Sandin* outside the prison litigation context, applying the usual state-law created interests standard outside of that context. *See Tony L.*, 71 F.3d at 1185 (remarking that under *Sandin*, the analysis for prison regulations "should focus on the nature of the deprivation rather than the language of the regulation involved" as it would for other state laws); *see also Jasinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013).

The district court brushed aside these material distinctions, reading a sweeping holding into a narrowly drawn Supreme Court decision. This was unwarranted. As explained above, Tennessee law creates a protected liberty interest in voting absentee by mail. Lower courts addressing substantively similar state laws have come to the same conclusion with near uniformity. *See also Self Advoc. Sols. N.D. v. Jaeger*, --- F. Supp. 3d ---, 2020 WL 2951012, at *8 (D.N.D. 2020); *Frederick v. Lawson*, --- F. Supp. 3d ---, 2020 WL 4882696, at *12 (S.D. Ind. 2020); *Richardson v. Texas Sec. of State*, --- F. Supp. 3d ---, 2020 WL 5367216, at *20–21 (W.D. Tex. 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, --- F. Supp. 3d ---, 2020 WL 4484063, at *53 (M.D.N.C. 2020); *Saucedo*, 335 F. Supp. 3d at 217; *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec. of State of Georgia*, 18-14503-GG, 2018 WL 7139247 (11th Cir. 2018); *Zessar v. Helander*, 05 C 1917, 2006 WL 642646, at *5 (N.D. Ill. Mar. 13, 2006). I find their straightforward application of

established principles more persuasive than the unsupported approach taken by the district court here.

**B.**

Having concluded that Plaintiffs are likely to prove that there is a constitutionally protected, Tennessee-law created liberty interest in voting absentee by mail, I would accept Plaintiffs' invitation to address the second step of the procedural due process inquiry, which the district court eschewed. "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Courts answer that question using the familiar balancing test from *Mathews*, which directs us to balance the private interest at stake "against the government's interest in avoiding additional or substitute process, in light of 'the risk of an erroneous deprivation' of a [liberty] interest 'and the probable value, if any, of additional or substitute procedural safeguards.'" *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018) (quoting *Mathews*, 424 U.S. at 335). These considerations uniformly favor Plaintiffs.

In cases like this one—where the state has failed to provide even the most rudimentary ingredients of due process—it is appropriate to begin with a consideration of "'the risk of erroneous deprivation'" and the value inherent in additional procedures. *See id.* (quoting *Mathews*, 424 U.S. at 333). That is because, despite all the case-specific flexibility of the procedural due process inquiry, *Leary v. Daeschner*, 228 F.3d 729, 743 (6th Cir. 2000) ("Due process is a flexible principle whose requirements depend on the facts of the individual case"), "'the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to a final deprivation of a [liberty] interest,'" *Hicks*, 909 F.3d at 799 (original emphasis) (quoting *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991)). Thus, "[a]t some foundational level, this factor is dispositive." *Hicks*, 909 F.3d at 800. Where the state has failed to provide the most basic requirements of due process—notice and a meaningful opportunity to be heard—the private and government interests take a back seat. *See id.*; *see also Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005) ("Notice and an opportunity to be heard remain the most basic requirements of due process.").

Tennessee's absentee voting law fails to provide these fundamental protections against the risk of erroneous rejections of absentee ballots on account of perceived signature invalidity. Presently, Tennessee law requires election officials to notify absentee voters if their ballot is rejected, apparently including where there is a signature verification issue. Tenn. Code §§ 2-6-202(g), 2-6-204(b). However, *the state does not afford the voter an opportunity to cure* the signature issue before the rejection occurs. *See id.* Plaintiffs seek, primarily, a procedure that would provide for pre-rejection notice, and an opportunity to cure any signature defect before their absentee ballot is rejected.

I begin with notice. The Tennessee statute does provide notice, but only after election officials have rejected the ballot. Post-deprivation notice is appropriate in only limited circumstances that do not apply here—this is not an emergency situation requiring immediate action, and Tennessee cannot effectively remedy an erroneously rejected absentee ballot once the election is over. *See Johnson*, 946 F.3d at 921 (identifying the exceptions to the "general rule that due process 'requires some kind of a hearing *before* the State deprives a person of liberty or property.'") (quoting *Zinermon*, 494 U.S. at 127); *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) ("Except in exceptional circumstances, not applicable here, before a person is deprived of either a liberty or property interest, he has a right to some kind of hearing."). Thus, the notice provided by Tennessee law is legally insufficient.

As for an opportunity to be heard, Tennessee provides none. Even with adequate notice, this would doom the state's argument—"after all, '*some* form of hearing is required before an individual is finally deprived of a [liberty] interest,' no matter how small the interest or how great the governmental burden." *Hicks*, 909 F.3d at 800 (quoting *Mathews*, 424 U.S. at 333 (emphasis added)). Plaintiffs are asking Defendants to provide the baseline requirements of due process—their request for an opportunity to cure is best understood as one for a form of hearing—but have been denied.

I do not place any significance on Defendants' (and now the majority's) insistence that *some* voters whose absentee ballots are rejected, may, if they receive their rejection notice in time, be able to request a new absentee ballot or vote in person. This relies, as Defendants acknowledge, on the assumption that the voter will receive the notice of signature invalidity

sufficiently ahead of the election, such that they could take advantage of these other avenues. But aside from Defendants' vague assertions that this is possible "if time allows," Appellees' Br. at 10, it is far from clear that the notice would arrive in time. At the absolute least, it seems exceedingly unlikely that notices of signature invalidity would arrive in time for those voters who submitted the absentee ballot requests a week before election day, as Tennessee law allows them to do. *See* Tenn. Code § 2-6-202(a). And even if the state were able to timely send these notices in prior years, delay is inevitable given the anticipated surge in absentee ballots this year. Furthermore, even where an absentee voter did receive notice of signature invalidity in time, there is no reason to think that they would be able to avail themselves of the in-person voting options, given that voting absentee by mail in Tennessee is generally limited to voters who cannot go to the poll for significant reasons. *See generally id.* § 2-6-201. That being the case, and given Plaintiffs' unrefuted expert testimony regarding the significant flaws in Tennessee's signature verification training regimen, it is a certainty that a significant number of erroneous rejections of ballots will occur, and that this will result in disenfranchisement. Especially given the anticipated surge in voting absentee by mail in Tennessee—the state has printed *four million* absentee ballots in preparation for the election, R. 40-2 (Doshi Decl., Ex. 2 at 7) (Page ID #221)—this is a disgrace.

In any case, the remaining factors also favor Plaintiffs. Whether derived from the Constitution or Tennessee law, the private interest at stake is significant. Simply put, voters—however they cast their ballot—have a profound interest in having that ballot counted. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) ("There is no right more basic in our democracy than the right to participate in electing our political leaders."); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("voting . . . . is regarded as a fundamental political right, because preservative of all rights"). The state does not reduce the significance of this interest by offering voters alternatives to in-person voting on election day.

As for the state's interests, first, Defendants assert an interest in "'counting *only* the votes of eligible voters.'"  Appellees' Br. at 48 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality opinion) (emphasis added)).  Fair enough.  But an opportunity to cure signature defects is fully consistent with this interest because it ensures votes will be counted more accurately than they would be otherwise.  *See Frederick*, 2020 WL 4882696, at *15 ("The State's claimed interests here, to wit, in preventing voter fraud and maintaining election integrity, are undeniably compelling interests.  As Plaintiffs point out, however, providing mail-in absentee voters notice and the opportunity to cure a perceived signature mismatch by confirming their identity in fact *promotes* these important governmental interests."); *Saucedo*, 335 F. Supp. 3d at 220 ("[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised.").  Indeed, the state itself, as much as the public, has an interest in "permitting as many qualified voters to vote as possible."  *See Obama for Am.*, 697 F.3d at 436. Furthermore, the state's interest in maintaining voter confidence, *see Crawford*, 553 U.S. at 194– 96, favors an injunction—by affording voters an opportunity to cure perceived signature defects, the state assures its citizens that proper votes will be counted, and improper votes will not.  A system that wrongly invalidates legitimate votes is at least as damaging to voter confidence as a system that does not protect against the vague threat of voter fraud.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised.").

Second, Defendants assert an interest in orderly elections.  Again, however, an opportunity to cure perceived signature defects *furthers* the government's interest rather than harming it.  Defendants' preferred alternative to an opportunity to cure is to have voters take steps to ensure their vote is counted, before or after receiving a signature rejection notice.  For example, Defendants insist that a voter whose absentee ballot is rejected can request another absentee ballot, cast a provisional ballot in person prior to the election, or vote in person on election day.  Appellees' Br. at 10.  They even suggest that a concerned voter could cast a provisional ballot in person before receiving a rejection of their absentee ballot.  *Id.*  I fail to see how these are more orderly alternatives to a streamlined opportunity to cure a perceived signature defect that forecloses the possibility of confused voters clogging up polling places

despite the fact that they have already attempted to vote. And to the extent the state's argument targets Plaintiffs' request that the opportunity to cure should extend beyond election day, I fail to see how this disrupts the state's electoral process where Tennessee law provides election officials until the third Monday after the election to certify election results, Tenn. Code § 2-8-101(a), Defendants themselves acknowledge that counting absentee ballots may end up taking days, R. 46-1 (Goins Decl. at ¶ 9) (Page ID #1826), and Tennessee law already provides post-election-day cure periods for failures to provide proper identification when submitting a provisional ballot, *id.* § 2-7-112(e)(5). Finally, Defendants' suggestion that absentee voters who are concerned that their mail ballots will be rejected should cast a *preemptive* provisional ballot in person in addition to their absentee ballot is more that "passing strange," Appellants' Reply at 14 n.11; indeed, it is downright farcical. Asking voters to work under the assumption that the state will fail to accurately employ its procedures is not a replacement for due process. Rather, it is an acknowledgement that the state has no interest in counting these votes at all. The effect of the majority is to tolerate this sham.

Defendants do not seriously argue that Plaintiffs' requested procedures would create a significant administrative burden. Nor could they given their insistence that a "strikingly small" number of ballots are likely to be rejected. *See, e.g.*, Appellees' Br. at 11. Indeed, some counties in Tennessee already go beyond the statutory procedure and take informal steps to help voters cure signature irregularities, suggesting it would not be burdensome to mandate an opportunity to cure across the board. R. 46-4 (Farley Decl. at ¶ 6) (Page ID #1857); R. 46-3 (Warren Decl. at ¶ 5) (Page ID #1854).

In sum, Tennessee's absentee ballot signature verification procedures fail to provide even the baseline protections required by due process. As a result, Plaintiffs would be likely to succeed on the merits even if their liberty interest were minimal and the state's interests were significant. The opposite is true here—Plaintiffs' interests are significant and the state's interests are not substantial—further demonstrating Plaintiffs' likelihood of success on their procedural due process claim. The district court erred in concluding otherwise, and the majority erred further in evading the question.

## IV.

Plaintiffs also allege that Tennessee's absentee ballot signature process unconstitutionally burdens their right to vote under the First and Fourteenth Amendments. This claim does not turn on whether Plaintiffs have a constitutionally protected right to vote absentee by mail; rather, it turns on the burden that Tennessee has placed on their right to vote, which their members indisputably enjoy, and whether that burden exceeds that which the Constitution will endure.

"The right to vote is a 'precious' and 'fundamental' right." *Obama for Am.*, 697 F.3d at 428 (quoting *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 670 (1966)). Indeed, "[i]t is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Illinois Bd. of Elections*, 440 U.S. at 184). Recognizing, however, that "[e]lection laws will invariably impose some burden upon individual voters," the constitutional question is not *whether* the state law in question burdens the right to vote, but to what extent, and whether it is justified. *Id.* In short, "while States can regulate elections, they must be careful not to *unduly* burden the right to vote when doing so." *Mays*, 951 F.3d at 783 (emphasis added).

As explained above, we assess whether a state has unduly burdened the right to vote by applying the "flexible" *Anderson-Burdick* standard. *Daunt*, 956 F.3d at 406. "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Thus, "[u]nder *Anderson-Burdick*, we first look to the burden the State's regulation imposes on the right to vote." *Mays*, 951 F.3d at 784. If the burden is "severe," then we apply strict scrutiny. *Id.* If the burden is reasonable, nondiscriminatory, and otherwise minimal, then we apply rational basis review. *See id.*; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358–59 (1997). Of course, this leaves cases that "fall between these two extremes." *Mays*, 951 F.3d at 784.

> For these intermediate cases, where the burden on the right to vote is moderate, we must weigh that burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'"

*Id.* (quoting *Burdick*, 504 U.S. at 434).   After all, especially in this intermediate zone, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons*, 520 U.S. at 359.

This case falls in such an intermediate zone, as most cases do.  *See Obama for Am.*, 697 F.3d at 429 ("Most cases fall in between these two extremes.").  On the one hand, where Tennessee's signature verification process results in an erroneous rejection, the burden is significant, particularly so in those cases where due to the timing of the rejection the voter has no opportunity to cast a ballot.  On the other hand, it does seem as though at least some voters who are timely notified of the rejection of their absentee ballots due to a perceived signature error will be able to successfully vote (although I harbor significant doubts about how often that will be the case), either by requesting and resubmitting a new absentee ballot by mail or voting in person, to the extent they are able.  Unlike the district court, I do not think *Anderson-Burdick* requires us to artificially divorce the signature verification *requirement* from the *procedures* that render it burdensome.  *See Crawford*, 553 U.S. at 198–99 (plurality opinion) (regarding voter ID law and opportunities to vote without the ID requirements).  But it is of no matter, because the district court ultimately assumed, correctly, that Tennessee's signature verification process fell within the intermediate zone and proceeded accordingly.  R. 77 (Mem. Op. at 35) (Page ID #2492).

To resolve this case, I do not think it necessary further to delineate where exactly that burden on the right to vote falls on the *Anderson-Burdick* scale.  That is because, "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"  *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).  Here, Defendants' asserted interests do not suffice for the same reasons discussed above with regard to Plaintiffs' procedural due process claim; those interests favor offering an opportunity to cure signature verification rejections, even after election day.  In short, Defendants' asserted interests harm their case rather than helping it.  Plaintiffs established a likelihood of success on the merits of their claim that Tennessee's signature verification process violates the First and Fourteenth Amendments.

## V.

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am.*, 697 F.3d at 436 (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). With that said, this election case involves uncommon circumstances with regard to the final three "equitable factors" that inform a decision on whether to grant or deny a preliminary injunction: whether the movant will suffer irreparable harm and the public and government interests. In light of those considerations, I would conclude that the equities favor Plaintiffs and that a preliminary injunction should have issued below.

Beginning with irreparable harm, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am.*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003)). Here, the primary harm that will be suffered is the erroneous rejection of otherwise legitimate votes. There is no remedy for such a harm once the election is over. *See id.* ("'A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.'") (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007)). Thus, our precedent firmly establishes that "[a] restriction on the fundamental right to vote therefore constitutes irreparable injury." *Id.*

The district court took a different approach, concluding that Plaintiffs failed to establish an irreparable harm after concluding that there is an "exceeding[ly] low" rejection rate for absentee ballots. R. 77 (Mem. Op. at 39) (Page ID #2496). It followed, according to the district court, that even though rejections occur, and even though "presumably," some of those rejections are erroneous, and even though Plaintiffs had "tens of thousands of members," Plaintiffs had not shown a likelihood of irreparable harm without some more specific assertion from Plaintiffs as to why they are likely to be harmed. *Id.* at 38–42 (Page ID #2495–99). The majority beats a similar track, repeating again its perception that Plaintiffs' harm is entirely speculative.

I think, to reverse the old adage, that the district court—and now the majority—missed the trees for the forest. When we review a facial challenge like Plaintiffs have presented here,

our focus "is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 894 (1992); *see also Kemp*, 918 F.3d at 1269–70. Thus, we are concerned with the nature of the harm, not its frequency. *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily."). As Plaintiffs aptly put it, "The fact that others have their ballots counted will be cold comfort to those disenfranchised. Even a single absentee ballot erroneously rejected comprises an irreparable injury warranting this Court's scrutiny." Appellants' Br. at 48. Tennessee's low rate of rejection is a distraction from this inquiry, and it permeated the district court's reasoning, now captivating the majority as well. Plaintiffs substantiated the likelihood that some of their members would have their absentee ballots erroneously rejected due to a perceived signature invalidity. That was enough.

Moving on, neither party spends much time on the public and government interests at stake, which makes sense given that it was not a focus for the district court and would be somewhat duplicative of the constitutional arguments above. Nor does the majority pass upon these factors. Suffice it to say, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 436–37. The state—I would think— shares this interest. And, as explained above, the states' interests are *furthered* by an opportunity to cure signature invalidity issues, not hampered by it. Plaintiffs' requested relief is not particularly onerous, as an administrative matter, especially compared to relief we have upheld in similar contexts. *See id.* (three extra days of in-person and early voting).

More fervently briefed is one final factor—timing. Indeed, this factor is high fashion in election cases these days. *See, e.g.*, *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *Bostelmann*, 2020 WL 5951359, at *1. Defendants argue both that Plaintiffs improperly delayed seeking relief and that in any case, relief is inappropriate this close to the 2020 General Election. Defendants' first objection—Plaintiffs' purported delay in bringing this suit—is unpersuasive. Plaintiffs brought suit just a week after Tennessee issued its contingency plan for the 2020 elections, which anticipated an unprecedented surge in voting absentee by mail. Before that time, which was at the beginning of the COVID-19 pandemic, Plaintiffs can be forgiven for not

focusing their efforts on Tennessee's absentee voting laws given that historically only about 2.5% of Tennesseans made use of that option. I do not fault Plaintiffs for failing to anticipate an abrupt, unexpected, and paradigm-altering occurrence like the COVID-19 pandemic and responding to it promptly when it became apparent that it would have implications for the 2020 election that they wished to address.

As for Defendants' second timing argument, I do not think Supreme Court precedent forecloses Plaintiffs' relief due to the proximity of the November 3, 2020 General Election, although I am cognizant that the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (citing *Purcell*, 549 U.S. 1 (2006) (per curiam)). Under this "*Purcell* doctrine," lower courts are required to weigh various factors specific to election cases, including the possibility of creating voter confusion, and risking disincentivizing voters from going to the polls. *Purcell*, 549 U.S. at 4–5. I agree with Plaintiffs that *Purcell* is no obstacle here because Plaintiffs' preliminary injunction would minimize voter confusion and does nothing to disincentivize voter turnout.

Regarding voter confusion, Plaintiffs' injunction would add a final step to Tennessee's signature verification process, requiring election officials to give an opportunity to cure signature defects before a ballot is rejected. This added procedural safeguard would *prevent* voter confusion caused by erroneous signature rejections by offering voters a clear mechanism by which to ensure their vote is counted. Without this added procedure, Defendants suggest voters could ensure their vote is counted by voting early or the day of the election in person, *even if they are not sure whether their absentee ballot has been counted*. This is certain to lead to confusion for the voter themselves, for poll workers, and for others. *Purcell* does not mandate us to rubber-stamp such a warped outcome. Moreover, even if this added mechanism somehow prompted voter confusion, it would be far from widespread. As Defendants have tirelessly repeated, absentee ballot rejections are relatively rare. Defendants have not presented any cogent argument for why these rare occurrences would lead to the sort of voter confusion that would mandate leaving in place an otherwise constitutionally inadequate procedure. After all, there is

no reason to think most voters will even become aware of the absentee ballot curing system if they are not one of the relative few who have their absentee ballots rejected.

Similarly, I do not think Plaintiffs' requested relief disincentivizes voter turnout. To the contrary, I think it more likely that it will increase the number of proper votes counted. Specifically, it seems to me that absentee voters in Tennessee who receive signature rejection notices are unlikely to make use of the alternative voting methods that might be available to them even if they were to receive notice in time that their ballots were rejected. Absentee voters in Tennessee must qualify as such, in many cases because they are unable to vote in person, at least without seriously risking their health and safety during the COVID-19 pandemic. And having their absentee ballots rejected for perceived signature issues is likely to lead to frustration and a lack of confidence in their state's electoral process as much as anything else.

To quote Plaintiffs, "[t]he *Purcell* doctrine . . . is not a magic wand that prevents voters from obtaining relief in an election year." Appellants' Br. at 49. Rather, it is an equitable doctrine that mandates that we consider concerns unique to election cases. Those considerations would not warrant withholding Plaintiffs' requested relief of an opportunity to timely cure perceived signature issues. The COVID-19 pandemic has upended American life in countless ways. In Tennessee, one of those ways is an expected surge in absentee voting, which has shone the spotlight on heretofore unscrutinized aspects of Tennessee's absentee voting system. Having concluded that one of those aspects—the state's signature verification procedure—is likely constitutionally inadequate in failing to provide an opportunity to cure, I do not think *Purcell* would have prevented us from acting. Indeed, the equities favor the issuance of a preliminary injunction, and the district court erred in refusing it. The majority—in failing to even reach the merits—irreparably compounded that mistake.

## VI.

"While I am saddened, I am not surprised by today's ruling." *Warshak v. United States*, 532 F.3d 521, 538 (6th Cir. 2008) (en banc) (Martin, J., dissenting). That is because many federal courts—more specifically, many federal courts of review—have sanctioned a systematic effort to suppress voter turnout and undermine the right to vote. Rarely does this have anything

to do with the merits of the case.  No, the effort has not been so bold as that.  Most often, *Purcell* provides the cover—a convenient court-made doctrine that provides plausible deniability sounding in vague cries of "confidence in the electoral process."  *See Purcell*, 549 U.S. at 4. Today, however, standing is the shroud of choice.  Whatever the disguise, the result is the same. Hiding behind closed courthouse doors does not change the fact that ruling by ruling, many courts are chipping away at votes that ought to be counted.  It is a disgrace to the federal courts' foundational role in ensuring democracy's function, and a betrayal to the persons that wish to participate in it fully.  *See Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined.").

On its own, today's ruling may not—likely *will* not—change the course of this election. But it is another drop in the bucket that is the degradation of the right to vote in this country. *See, e.g.*, *Raysor*, 140 S. Ct. at 2600 ("This Court's order prevents thousands of otherwise eligible voters from participating in Florida's primary election simply because they are poor.") (Sotomayor, J., dissenting); *Republican Nat'l Comm.*, 140 S. Ct. at 1211 ("The majority of this Court declares that this case presents a 'narrow, technical question.' That is wrong. The question here is whether tens of thousands of Wisconsin citizens can vote safely in the midst of a pandemic.") (internal citation omitted) (Ginsburg, J., dissenting); *Bostelmann*, 2020 WL 5951359, at *13 ("It is a virtual certainty that current conditions will result in many voters, possibly tens of thousands, being disenfranchised absent changes to an election code designed for in-person voting on election day.") (Rovner, J., dissenting).  I fear the day we come out from behind the courthouse doors only to realize these drops have become a flood.

I dissent.